The next case is number 22-1783-22-2055, Thomas J. Kairys v. Southern Pines Trucking, Inc. Yes, yes, my name is Audrey Copeland. I'm here on behalf of the appellant in this case, Southern Pines Trucking. I would like to reserve two minutes for you. By the way, I've talked brought by the plaintiff originally under the ADA, the ADEA, PHRA, and the focus of this case, which is the ERISA claim. The plaintiff was hired in March 2016 as a vice president of sales to grow Southern Pines Trucking's cryogenic trucking business. His position was eliminated about two years later, in April 2019, when the specialized cryogenic trucking fleet was maxed out at 100% utility. There is no longer any need for new sales by Mr. Kairys. Well, the district court found otherwise. The facts that you just were arguing are contrary to what the district court's opinion found. I believe that the district court found that maybe he possibly could have worked in a different capacity, but I don't think the court found that the sales were maxed out. Now, the trucking company, when Mr. Kairys first joined, had about 10 to 14 of these specialized tankers. Now, these tankers cost about a quarter of a million dollars each, along with the trucks. They wanted to expand industry. Mr. Kairys had experience in this particular area. In fact, I believe he worked for a company that sold him some of the trucks. So they utilized him, utilized his contacts. They bought additional trucks, and they ended up at about 33. At that point, all the trucks were utilized. They were dedicated to certain customers, and the only way to expand the business and get more sales was to invest in more trucks, as the CEO, Mr. Gallagher, said, at a quarter of a million dollars per pop. That wasn't the direction that SBT wanted to go. There were also a number of companies associated with SBT. PGT, which is flatbed trucking, Pine Tree, which is drivers, they just didn't want to expand SBT, and they could not make any more sales without buying any more trucks. They no longer needed sales, so they no longer needed Mr. Kairys as the vice president of sales. Are there any undue impacts of the jury in that trial that wouldn't include Mr. Kairys trial? Well, as the district court itself indicated, the claims and the evidence were pretty much interrelated and overlapping. So, first of all, in this case, unlike the district court said, the jury did make explicit but also implicit factual findings. The jury found that Plaintiff failed to prove by provonders of the evidence that Southern Pines discriminated or retaliated against him because of his disabilities or because of his age. Therefore, the judge, so in other words, it was a defensive verdict across the board, including the advisory of As part of that, the jury necessarily had to find that Southern Pines provided a legitimate non-discriminatory reason for terminating Plaintiff that was not pretextual. As to disability or age? The jury did not make a finding, did it? The jury made a finding of no discrimination, no retaliation in those other claims. In the other claims. But there was only one reason given by Southern Pines Trucking, the one legitimate valid reason. We don't need any more sales. We are maxed out. We don't want to spend another $250,000 per truck to expand these sales. So there was no evidence put on by the defense about disability or age? The only evidence you put on was that he was hired as a temporary employee to deal exclusively with cryogenic trucking and that was it? That was your sole defense? Well, I mean, there was evidence that there was no connection. There was no connection between his age, no connection between his disability. And the judge, when he did his factual findings, said there was a connection. Well, there wasn't a connection. He didn't do anything to upset the claims, including respect to no connection to age or disability. The judge found there wasn't. Because the judge stated temporal proximity between the firing in April and the beginning of the new benefits here in May, correct? That's correct, but I don't think that was even part of the plaintiff's case in that instance. The only temporal proximity arguments had to do with a supposed conversation, which if believed would have occurred anywhere from 17 months to perhaps after the November 2017 argument, which would be five months from the termination date. I'd also like to point out with the district court... Well, yeah, you're right. There's not great temporal proximity from the plaintiff's perspective with respect to the December conversation, right? That's the five month gap you're talking about. With Pat Gallagher, there was a conversation that was not close to the termination date. Like at the Christmas party conversation, any conversations before that, or even if you believe it was a conversation afterwards. But the district court didn't lean on that. As I recall the district court's opinion, what the district court leaned on was the high expense occasioned by the hip replacement, the fact that he had indicated he was going to have another hip replacement, and the highlighting on the form of this expense. Now, the form did not have Mr. Cary's name on it. It had a script like employee number one or something. Isn't that what the form indicated? It didn't indicate employee. It did not indicate the medical procedure. Was it employee number one? It was O1 or something, wasn't it? I believe it was. Okay, so that's Southern Pines Trucking's O1, number one. It's not hard to infer. The district judge inferred that. And how many employees did Southern Pines Trucking have at this time? I think they had... The whole company, I believe, was anywhere from like 300 to 600. Yeah, when you say the whole company, to whom are you referring? Like PGT. Okay, well my question is how many employees did Southern Pines Trucking have at this time? That I'm not exactly certain. It's not three? It's a different insurance. It's not three? I think it was something about perhaps 30, but also some include drivers and some included the office personnel, such as Bob Gallagher, Mr. Wright, and also Mr. Carries. And if I might just go back a little bit with regard to sort of trying to settle that you couldn't really separate the claims that they were intertwined. The disability discrimination claim was also based upon Mr. Carries having to have surgery at the cost of the surgery, and that's precisely what the district court charged the jury. So those two were absolutely the cost, which is what the ERISA is based on, and the disability discrimination, which the judge found in favor of Southern Pines Trucking, both relied upon the cost of the surgery. And the jury returned a defense verdict across the board, even on the advisory claim. What was the cost of the surgery? That was never made part of the record or never disclosed. There were just some suggestions made by the fact of highlights on the invoice. What was the amount that was highlighted? I think it was around $11,000 to $12,000. It wasn't for November of 2017. It was for a period after that. Let me ask you this. You made reference in your argument in your brief that there were findings of the advisory jury on this retaliation claim. So what were those findings? So the jury found that the claim should not be proved by preponderance of the evidence that SBT retaliated against him for having exercised his right to ERISA-protected benefits or interfered with his right. Here's the question on the verdict slip. Is that correct? Correct. But in order to – but the implicit findings also are out of that. Right. So it's really – there was no real explicit factual finding because this is a general verdict slip. If you're going to prevail, it's because there had to be certain findings that were that the judge would have to adhere to. Well, it was specific that there was no retaliation and no discrimination. Right. And that carried over to the advisory verdict also. So if there was any question about what the jury found on everything, it was no discrimination, no retaliation, therefore no pretext. But didn't you agree that the advisory verdict would not be binding on the – That is the case law. The case law is that a district court is not bound by the advisory verdict. What does that mean? Well, I mean it doesn't have to return the exact same verdict. In other words, you could also have a jury that was asked to decide two legal issues and then the judge – and decided them differently. So then the judge might not be bound by things that are inconsistent. He might want different findings that were completely inconsistent with a particular actual issue that the judge had to decide. Did the district courts make a legal error or a contested error? Well, it's really both. Because factual findings were – the standard for that is clear error. So they were clear error because they weren't supported, number one. But number two – Well, which were – don't go too fast. Which specific – the opinion was very comprehensive. Which specific factual findings did the district court make? We specified those in a section of our brief. For example, the district court found that SPT had argued that the Cary's employment was only temporary. That was never argued. That the district court drew inferences that Pat Gallagher, the CEO, was generally aware of the expenses. I thought you began your argument here by saying that his employment was temporary because as soon as they maxed out on the cryogenic sales, his job would terminate. He wasn't employed on a temporary basis. He was employed to grow the business, to grow this particular aspect of the business. He was an at-will employee, correct? He was an at-will employee. And he was successful. He received bonuses. But at a certain point, SPT decided they did not – they bought a few additional trucks. They were also maxed out. But SPT didn't want to pursue that. Didn't want to pursue what? The additional cryogenic trucking industry that was very specialized and also not only expensive beyond a certain point, but required highly qualified drivers that were difficult to obtain. Also, once you obtained the customers for the fleet that you had, in other words, to expand that business, you had to expand your fleet because the trucks were essentially assigned or dedicated to particular clients. If things were going so badly, why did he get such a big bonus right before he was terminated? Well, the bonus structure changed. And I think actually the fact that he got a bonus shows that there was no discriminatory firing. It was based on – Wasn't the company required to give him a bonus? Wasn't that part of his deal? There were several different changes in bonus structures. His salary increased at one point. And I believe it might have been because they changed the bonus structure at that point. But the bonus structure at the time, I believe, was based upon performance. And so he performed. And about that time, all the rest of the trucks that had been acquired were then fully utilized. He had done that, so he didn't get a big bonus. But after that, it was a business decision, a pure business decision that they no longer needed sales, did not want to expand the business and buy more expensive equipment. That was the defense. It was a business decision. And the judge said, I find that pretextual for six reasons. Why are his six reasons wrong? Can you go through the six reasons why he was clearly erroneous? Well, he was erroneous because— His first reason was—let's just go through them. Other clients did not present any evidence that it had told plaintiffs he was only a temporary addition and tasked with the completion of a specific objective. How was that clearly erroneous? Well, that might not be a clearly erroneous finding per se, but there was never— But they didn't have to. All right. The next one is Southern Pine's bonus plan recognized that full utilization was a goal that could fluctuate frequently. His offer letter specifically incentivized full utilization with a $3,000 maximum bonus, and it did not warn him that such an achievement may subject him to termination. How was that clearly erroneous? Well, I think it's clearly erroneous because the court then used that to bootstrap its legal conclusion. Forget about the legal conclusion. How was that—that was a fact finding. How was that clearly erroneous? What evidence in the record shows that what I just read to you is clearly erroneous? Well, Southern Pine didn't tell him that it was temporary and that he would be discharged. It's like if you're a temporary administrative assistant and you work for a company that that's just the way it is. He was very effective. And I think at the time he was hired, there was some interest in expanding the industry for this particular line of business further. That changed when the company emerged with someone else, and the focus was not on expanding that particular program. So— Okay, but I mean, there was a— There was, but it also changed in a certain way. Because I think— When did it change and how did it—or why did it change? I believe it changed because they were trying to figure out how much profit they were making and various things, and I believe, and I'm not 100% sure, that that's when the salary was raised. But then the bonus plan came back into effect, I believe, based upon profitability. Then again, after he left, it changed again and was based upon more like safety. So there were various changes of the bonus plan. But he still received his salary, he received a raise, he received his bonuses. He received the bonus that he was entitled to for being profitable right before he was So it wasn't a matter of paying him bonuses that he was entitled to. Was the judge clearly erroneous to make a finding that Bob Gallagher told Pat Gallagher that he—Carrie's needed to lay low? Well, the evidence was disputed on that. I think for the jury to have found everything else a complete defense of right across the board, they did not believe Mr. Carries and they did believe SBT's witnesses that that conversation— All right, so that gets back to the questions my colleagues were asking, I think, which is what I heard you just say, in essence, and correct me if I'm misinterpreting or misunderstanding what you're saying, is that because the jury made a complete defense on age discrimination and disability discrimination, the trial judge, with respect to the ERISA claim, was required to presume that the jury believed all of SBT's evidence and disbelieved all of Carrie's evidence. Is that your— Well, the trial court itself admitted that everything was pretty much based on common evidence. And, of course, it's understandable that a witness's testimony can be disbelieved in part, but I think it's evident from the jury's verdict that they did not believe Mr. Carries. Well, they didn't believe him in part or they didn't believe anything else? Well, I'm not sure that you could believe anything he said except—well, I'm just trying to even think and still return those defense verdicts. And the point was that— Let's stipulate that you're right about what the jury believed at that trial. It would be error for the district court to make the opposite predictability determination on the ERISA claim. It would because, for instance, we show you the case, the Romero case. When legal and equitable—I'm sorry, it's a district court case. When legal and equitable claims are coupled, a district court is bound by a jury's explicit findings of fact and those findings that are necessary implicit in the jury's verdict. So that's what this court said in the Ashton-Johnson case in 2009. When litigation involves both legal and equitable claims, the right to a jury trial, including all issues common to both claims, must be preserved by trying the legal claimant to the jury first— that's what happened here—and at least simultaneously with the equitable claim and by accepting the jury's findings on common facts for all purposes. And this court said in Roebuck in 1988, principles of collateral estoppel and jury supremacy precluded district court from issuing a judgment that variants were the jury's findings. And again, it's because of the type of the jury's findings, because of the intertwined claims and common facts, the jury necessarily found that it was validly determined he would have been terminated had he not used those protected rights and there was no pretext. And that there really is simply no way around in this particular case, especially because the disability claim also rested upon his use of the insurance benefits and the expense of those insurance benefits. Ms. Cope, I'd like to hear your argument on the attorney's fees question. The court gave the plaintiff a 25 percent haircut. Why was that an abuse of discretion? And it really was because, again, the cross-the-board defense verdict. And the plaintiff themselves took a 5 percent off the top. The district court took off an additional 20 percent. We said it should be 40 percent because of really the complete lack of success on any of those claims, on all the intertwined claims. And we thought that, you know, the plaintiff had said they thought 5 percent was fair. We thought 40 percent was fair. The district court disagreed. And we think more should have been taken off to account for that lack of success. How do you get to more? How do you calculate more? I mean, is there any record that shows the amount of time that was spent on the jury trial versus the amount of time that was spent on the post-jury briefing that was submitted on the question that led to the findings, the fact, and the non-jury verdict? Yes. I mean, it's pretty much specified in the petition fees that the plaintiff filed. I mean, there's no question about that. But they're really two different issues because 40 percent was off the verdict by the jury. And then we wanted all of it off of the post-verdict briefing on ERISA because the district court said in open court, I heard the evidence. I can decide it. It wasn't necessary. Yeah. So that was our argument. The district court denied any discount as to the ERISA briefing in that case. And everything else is based upon fees that we went through and thought would have involved witnesses that were not materials for those particular things, that weren't entities that weren't specifically identified, and all of that. So I think it's pretty much laid out in this brief. And if there are any other questions. We'll hear you on the phone. We'll hear you on the phone. Thank you, Ms. Cooper. Ms. Elder. Thank you, Your Honors. May it please the court, Christine Elzer for the appellee, Thomas Carries. Members of the panel, everything that SPT's counsel has argued about the district court being bound by the jury's verdict as to the age and disability discrimination claims has been forfeited or waived. SPT not only failed to raise this argument below, but actually conceded the opposite. It explicitly stated that the district court was not bound by the jury's verdict. And specifically about the age and disability discrimination verdict, they called that verdict persuasive in the brief to the district court. That's on page 746 of the record. SPT specifically said that the court could adopt the advisory verdict if it so chooses. So this is more than just a waiver or a forfeiture. This is taking an explicitly different position on appeal than taken below. And SPT hasn't presented any excuse for this about face or even acknowledged the contradiction in its position. And like the argument that happened earlier this morning, SPT cannot point to a page number below where it ever raised this issue of the district court being bound by the jury's verdict. So for that reason alone, this court can dispense with that argument. The whole purpose of appellate review is to determine whether the district court made a mistake. If an argument wasn't made to the district court in the first instance, there can be no no mistake for them to make. Let me ask you this question. On this ERISA retaliation claim, don't you have to show that the cost of the surgery was a determinative factor in Southern Pines terminating Cary's? If the court wants to reach this issue, we don't have to show that the cost of the hip surgery itself was a determinative factor, but we'd have to show the use of benefits was a determinative factor, which could include the cost of hip surgery and also other costs. Is Miss Copeland incorrect that the line item that is in question that may have been yellowed out was around eleven thousand dollars in costs? I believe it was about twenty three thousand. Let's assume twenty three thousand. OK. Cary's was making one hundred and forty thousand a year and also received bonuses. Seems to me that even if it's twenty three thousand that in the total package, that could be considered to be a bonus. Well, I mean, that that is one inference that someone could make. The district court, as the fact finder made, drew a different inference. Yeah, but looking at those numbers, isn't that a potential basis for us to find that the fact that the findings of fact by the district court are clearly around us? I don't believe it is because the district court, the Supreme Court has made clear in the Andrews case, I believe it is that when two minds can reasonably disagree about which inference to draw, it can't be clearly erroneous. And again, we're not just looking at the cost of one surgery. Every single use of benefits over a six month period was highlighted that SPO one. And to judge Hardiman's question, there were three employees. That's what I thought. And not only that, but the judge, the district judge also found Arisa interference, which is preventing firing somebody to prevent them from future use. And Southern Pines knew that Mr. Carries was going to have to have a second hip surgery. So that is that what saves your case? Because I think there is an argument that if you didn't have a future expense. Well, I, I'd like to address why the verdicts aren't irreconcilable. But to your question, Judge Hardiman. Yes, I do. I do think that the Arisa interference claim is particularly unique. The Arisa interference claim does not overlap as much as the retaliation claim would with the ADA claim, because it's about future use, which somebody being over age 40, somebody being disabled is not the same. And there's a chance that there's a chance that Gallagher's decision was not Arisa benefits claimed by Carries had cost the company. His decision in April before they were starting a new benefits here could have been influenced by how much he expected Carries to cost him cost the company in the next year. There is absolutely that chance, but the district court found both both that it was the past cost and the anticipated. So even if so, even if we find that the past cost was an error by the district court, because that the district court was was bound by what the jury had found in that report. Your argument is that you still prevail because there's no way that the jury's verdict on age and disability discrimination could have infected to use the word the future decision is that absolutely. Now, this is not this case, and maybe this is an unfair question to you, but it seems to me that a decision like this could lead employers to say, I'm not going to provide health insurance. Because if health insurance and the cost of health insurance. And get me into a retaliation situation for a lawyer. It's too dangerous. Well, I think that's a policy argument for Congress. I mean, I do understand that issue, but I mean, Congress is the argument for Congress. I'm sorry. It might be a policy argument for Congress. Congress passed the Risa. And the self insurance self insured plans, which people who are self insured get a chunk of the bill to pay. But. This, it seems to me this retaliation concept is a real threat to working men and women. Well, I mean, I do think the existence of interference and retaliation claims do provide a disincentive for self insurance in particular, because, you know, if you play a flat premium, it'd be very hard to imagine a situation where an employer would retaliate or interfere with a flat premium. This employer chose self insurance to keep its cost down. There's a lot of evidence in the record. This is the danger of self insurance. I mean, I think it is the danger to employees and employers, but the court's not writing on a blank slate here. I mean, Congress have intended that. I think so. I think that that's why Arisa remedies are limited, why it's equitable only why an employee can't get punitive damages, compensatory damages, even back pay in the 3rd Circuit. I think that's Congress balancing all these issues and saying, we at least need to make these people whole. We at least need to prevent issue equitable relief. But at the least, you can see that this incentive to self insured plans. Yeah, I would say so. I mean, I, but I think that, you know, it's it's a disincentive employers shouldn't be discriminating or retaliating. I mean, that's that's the law that Congress made. It's been interpreted by this court many times to say that an employer cannot use the use or future use of benefits as a means of making an adverse employment action. It can't be a determinative factor. So, to go back to, you know, the, the advisory jury, I mean, I think we all nobody disputes here that the verdict was advisory that Congress entrusted judges and not juries to make factual findings inclusions law and Arisa claims. And we also know from the Hayes decision that on appeal and advisory verdict is to be treated as if there was no advisory jury recommendation at all. So, the fact that the jury issued an advisory verdict should not play into this court's decision at all. Sounds like an aggressive argument. Are you saying that if, in this case, instead of a general jury verdict form, there were very specific jury. Are you arguing that if the jury had made specific factual findings with respect to age and disability discrimination, that this district court could have written opinion, making factual findings directly contrary to the explicit findings of the jury. No, I'm not arguing that I think we need to keep separate the fact that the Arisa advisory verdict, the court can't consider at all. All right. So, whatever factual findings the jury makes on the other claims they transmit into the Arisa. Right. But the problem I take your argument to be that that the defendant has here the appellant has here is that we don't know exactly what those were because we're just dealing with a general verdict. Exactly. Under rule forty nine, they could have requested special verdict form actually under rule forty nine. When you don't request a special verdict form, you've waived the right to a jury trial on specific facts and you're stuck with the facts as the district court finds them. All right. Does that mean in the instance like this case with a general verdict form that there are no implicit factual findings that carry forward into the judges adjudication of the risk? I don't know if I would go as far as to say that there are no implicit, but there are no implicit factual findings that are contrary to the. I appreciate that answer because I think that's the right answer. Then the hard question becomes, what are they? Well, what are the implicit factual findings that the district court here had to take cognizance of in rendering his decision that Mr. Those are explicit. Those are the answers to the general verdict form. Then I mean, it's it's hard. It's hard to to nail down anything else implicit. I mean, that's the problem with being implicit. You know, it's we we don't know. I mean, what I will say is it's not implicit in the jury's factual findings, but they believed everything the defendant said and they disbelieved everything the verdict form said instead of what it says. Asked the question was cost was the cost to Southern Pines or health care for Mr. It carries a determinative, determinative factor in his termination. And if the jury said no, what about that? What about the answer to that question? See, I think that would be an interesting issue because there's no right to a jury trial under Arisa. Right. So if the jury did find that the court wouldn't be bound by it because. Is there a difference between being bound by it? And being required to consider. I mean, I guess, could the judge consider it on, like, an abuse of discretion standard or something? Maybe, but, you know, I'm not really sure that that played in here. I mean, the jury didn't find that. If the jury did find that, if that had been on the verdict form, I think at best, it could have precluded the Arisa retaliation. Finding by the district court, but not the interference because there's a difference between past use and future use, and the future use was not part of the claim or the age claim. You know, and I will say, too, that. But at the very least, Judge Fisher's fascinating hypothetical, at the very least, the district court would have some explaining to do. Absolutely. District court would have to really dig in and explain why it was taking a different course than what the verdicts. Yeah, I absolutely think so. But, you know, that didn't happen. And Southern Pines. Yeah, I mean, you know, it could have been good for us. It could have been bad for us. You know, if we had won, we would have, you know, made, you know, one of that. But, you know, nobody asked for special verdict form, and they did that at their peril. I mean, that's where rule forty nine says the Perdoni brothers case out of the third out of the First Circuit that cited in footnote ten of the brief actually talks about this. When an advisory jury does not answer special verdict forms, it's conjecture to say what they would have found. And, you know, I do disagree that it's implicit in the jury's findings that they disbelieved that Mr. Gallagher told Mr. Because how do we know that Southern Pines move for summary judgment and follow rule fifty motion halfway through trial saying even if you believe everything Carrie says is true, even if you accept everything in the light most favorable to him, we still win. So they've already conceded that the jury could believe everything Mr. And that doesn't mean that he wins an age claim. It doesn't mean he wins a disability discrimination claim. So they can't then turn around and say that it was implicit in the jury's findings that the jury disbelieve these things, especially when they didn't ask for a special verdict. Sure. Yes, so Supreme Court in this court have made clear over and over again that the court, the district court has significant discretion and awarding attorneys fees. And this court can't reverse the trial court as long as it applied the correct standards and procedures and made findings of fact that weren't clearly erroneous. And here the district court thoughtfully applied the law to the facts and cut the fee by twenty five percent. You know, Mr. Kerry's only requested a ten percent reduction. We didn't appeal because the district court has that discretion and there'd be no basis to appeal. The district court correctly applied the Hensley decisions principle of a common core of facts between successful and unsuccessful claims. One thing that hasn't been brought up here, too, is that Mr. Kerry's did prevail on a claim before the jury to claims about the wage payment collection law and the breach of contract claim. There were inextricably linked in a lot of ways because it had to do with the reason for his termination and some of the other actions of the defendant. It would have still required a jury trial money. Was it his last paycheck or something? It was it was two weeks of pay. Yeah. And I mean, they made I mean, they raised a bunch of defenses. They claim they were entitled to an offset. You know, they made it a big part of the case. You know, there were, I think, like five questions on the verdict form about that claim alone, where the jury did make, you know, more specific factual findings. So because of that, I mean, there was a common core of facts and S.P.T. doesn't even dispute in its brief that there was a common core of facts. They just say you should have cut the fee by more than you cut it by. And they can't point to any decision by this court or any court that says a 40 percent reduction is required in this circumstance. I will also say that this is the third time now that S.P.T. has misrepresented the record about the district court saying that it did not want briefing on the ERISA. They said this to the district court itself. They said it in their brief and they've said it again here. And it is absolutely not the case. He didn't say I don't want it, but he didn't say he needed it either. He said I go ahead. He said, yeah, you you offered to write a brief. I said, OK. He said, OK. And he also said, you know, you might want a brief remedies, which, you know, I think really should have signaled to Southern Pines. They should if they thought the judge was bound by the jury, that was the time to make the argument because the judge, you know, it was hinting that he might find in our favor. But he said, go ahead and brief remedies, go ahead and confer about what you want to submit. And we filed a joint motion, a joint briefing schedule. So to say that in any way that I insisted on filing a brief over their objection is absolutely not the case. They fought a brief. Presumably they got paid to file that brief. But they say I shouldn't get paid, you know, even though I prevailed. And that is just, you know, there's no law to support that, particularly under an abuse of discretion standard. All right. Thank you. Thank you. Thank you. Thank you. First of all, there's no way to claim. There's no way to claim made by the plaintiff at any point until the appellate brief. And as this court well knows, the claim that someone waived an issue can itself be waived if it is not raised. It was not raised before the district court. District court did not discuss waiver. So all those waiver claims are out the door because they were not preserved before the district court. In addition, with regard to our brief, our recent brief on to the effect of the advisory verdict on the district court. The law does say that a district court is not bound to accept the jury's advisory verdict. But in this case, our argument was that it can't decide inconsistently with the jury's verdict. And then again, we talked about the common evidence and we talked about how it differs from the determination. What's the difference between not being banned by and deciding inconsistently? Well, it could it could depend on what exactly it was before the jury and it could exactly. It also could be like a depend on conclusions of law. But in this case, it was really that the district court itself admitted that the claims were all related. The evidence was all related. So it became something very, very similar. But, you know, we want but the court does the case law does say that you're not bound per se by the advisory verdict. And we wanted to make sure that was made that we agree that was made by the court. But the court had to decide the case consistently. And this decision was not consistent. If they had to decide it consistently with, then it sounds like they weren't bound. Well, consistently with the jury's findings. Well, right. When it comes down to it and we are permitted, I think, before this court, so long as we preserve an argument to more fully develop it before this court, which we did, we cited some of the same cases. We say this cited some additional cases in order that the court understand the behind the reasoning behind everything. The reason behind why some difference between legal verdicts and equitable verdicts. And the reason behind why those common factual findings are binding with the district court, when it makes an equitable decision on an intertwined or interrelated claim. And that's what we did. We think that it's fairly included in the arguments we made in our recent brief before the district court. With regard to the invoice, I'd like to point out that there is no evidence that SBK made those highlights on invoice. We don't know. We don't know who did. We don't know who did it. And the district court drew an adverse inference. Unsurprisingly, when the people who created the files had custody of the files, owned the files, testified, they didn't know how the highlight got. Well, the invoices came from the third party administrator. They didn't. They weren't produced in-house. So it's not like someone has produced all these invoices. Nobody knows. Nobody knows. And again, those invoices did not come originally from Mr. Bargo or anybody in his department. Nobody knew how they got there. And I think the significance is minimal anyway, especially considering the various costs. So with regard to interference for future use, the claim was that he would have to have a second hip replaced at some point in the future. Now, at the time he was terminated, he had not talked about when he was going to have this done. There was no set date for having the second hip replaced. And it was ultimately the record shows that it was not replaced until December 2018, which is months and months and months after his termination. So that's very significant because I think then you have a temporal proximity argument there. So that doesn't save the rest of the case. It's just another reason why that interference claim didn't work, because it's not like he went out and got it done. It was months and months. So therefore, with regard to how much carries would cost in future surgeries, it wasn't even scheduled at that point. Nobody even knew. And of course, no evidence that anybody, especially this decision maker, CEO Pat Gallagher, knew the cost of surgery in any way linked to the termination decision. And that that surgery was never challenged. That surgery was paid for entirely. As Mr. Carries admitted, Mr. Carries admitted no one ever challenged him for time off. His direct supervisor actually sent him an email when he discussed having the surgery later in the month. Hey, let's meet for lunch. OK, hope goes well. Thank you, Ms. Copeland. We understand the argument to the other side. We appreciate the argument. We'll take the matter under advisement. Thank you.